## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ANTONIO LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 10-0166-CG-C |
| | ) | |
| CITY OF MOBILE, et al., | ) | |
| | ) | |
| Defendants. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the court on the motion of Joe Cotner for summary judgment (Doc. 124), the motion of Kevin Rodgers for summary judgment (Doc. 127), plaintiff's responses in opposition (Docs. 137, 139), Cotner's reply (Doc. 143), and Rodgers' reply (Doc. 142). The court finds that both Officer Cotner and Lieutenant Rodgers are entitled to qualified immunity. Accordingly, their motions for summary judgment are due to be granted.

## <u>FACTS</u>

This case arises from an incident which occurred on July 24, 2009, at a Dollar General store in Mobile, Alabama. The Second Amended Complaint asserts the following claims against Joe Cotner and Kevin Rodgers: (I) § 1983 claim for false arrest, (II) § 1983 claim for excessive force, (III) state law false arrest/negligence, and (IV) state law claim for assault and battery. (Doc. 72).

The plaintiff in this case, Antonio Love, has no hearing in his right ear and "just a little bit" of hearing in his left ear. (Doc. 125-1, pp. 2-3). Plaintiff wears a hearing aid in his left ear to assist with hearing. (Doc. 125-1, p. 16). Plaintiff can only speak "some" and can read lips "a little bit." (Doc. 125-1, p. 3). Plaintiff also suffers from schizophrenia and takes medicine to treat his schizophrenia. (Doc. 125-3, p. 3, Doc. 125-4, p. 2).

On the date of the incident, plaintiff entered the Dollar General store to buy soda and chips. While there, he started having cramps and went to the restroom to use the facilities. (Doc. 125-1, p. 8). Plaintiff locked the door to the bathroom and stayed there for 20 or 30 minutes (Doc. 125-1, p. 9).

Plaintiff did not take his medication on the day of the incident. (Doc. 125-3, p. 3). While he was in the bathroom at the Dollar General store, plaintiff heard voices from his alto ego, Tony. (Doc. 125-1, p. 5). Plaintiff testified that Tony is bad and tells plaintiff to do bad things like "get knives and cut," which would cause him to cut himself. (Doc. 125-1, p. 6). Plaintiff was having hallucinations on the date of the incident: he saw a smoke figure. (Doc. 125-1, p. 7).

The store manager, Kenneth Gooden, tried to open the bathroom door to get a mop and found that it was locked. (Doc. 125-5, p. 8). Gooden did not know who was in the restroom. (Doc. 125-5, p. 6). Plaintiff testified that he did not see the manager before he went in the bathroom. (Doc. 125-1, p. 12). About 20 minutes

later, Gooden went back to the restroom to use the bathroom and it was still locked. (Doc. 125-5, pp. 8-9). Gooden knocked a couple times, but got no response. (Doc. 125-5, p. 9). Gooden tried to push on the door and open it and knocked hard, because at that point he was worried about what was going on in the restroom. (Doc. 125-5, p. 9). He said, "this is the store manager, could you please open the door." (Doc. 125-5, p. 9). After getting no response, he decided to call the police. (Doc. 125-5, p. 9). Gooden went back and looked under the bathroom door with a flashlight and saw what looked like paper towels rolled up and pushed under the bottom of the door and a rubber boot. (Doc. 125-5, pp. 11-12). Gooden knocked on the door and again said that he was the store manager and "could you please open the door." (Doc. 125-5, p. 12). Gooden went to the stockroom and found a mop and pushed the mop handle under the door to try to push the paper towels out of the way. (Doc. 125-5, p. 12). Gooden also tried to open the door with a screwdriver, but could not get it unlocked. (Doc. 125-5, p. 13).

The bathroom had been locked for 45 minutes to an hour by the time the police got there. (Doc. 125-5, pp. 10-11). Officers Joe Cotner and Harry Milbrath arrived at the Dollar General store at approximately the same time. (Doc. 125-8, p. 2). Gooden told them that somebody had locked themselves in the bathroom and would not come out. (Doc. 125-5, p. 13; Doc. 125-8, p. 2). Gooden told the officers that he did not know who the person was. (Doc. 125-8, p. 2). The officers walked

back to the restroom and knocked loudly on the door and said "this is Mobile Police, open the door," but there was no response. (Doc. 125 -5, pp. 13, 14; Doc. 125-8, p. 4). They could see under the door that plaintiff had put his foot up against the door. (Doc. 125-8, p. 4-5; Doc. 125-10, p. 3). Gooden told the officers that there was no key for the restroom door and the officers tried to open the door with the screwdriver, but were unable to get it open. (Doc. 125-5, p. 13; Doc. 125-8, p. 10; Doc. 125-10, p. 4). The officers warned that if he did not open the door they would use pepper spray. (Doc. 125-5, pp. 14-15). The officers got no response and Milbrath sprayed pepper spray under the door. (Doc. 125-5, pp. 14-15; Doc. 125-8, pp. 5-6). Cotner and Milbrath's pepper spray canisters did not have very much in them, so they radioed for other officers with pepper spray. (Doc. 125-8, pp. 6-7). Two more officers arrived. (Doc. 125-5, p. 14). At some point while plaintiff was locked in the bathroom, Officer Cotner called his supervisor, Lieutenant Kevin Rodgers and filled him in on what was going on and Rodgers came out to the scene. (Doc. 131-1, pp. 6-7). Milbrath sprayed more pepper spray under the door. (Doc. 125-8, pp. 7-8). They could hear movement and someone coughing inside after the pepper spray was used. (Doc. 125-5, pp. 14, 15; Doc. 125-8, p. 8). Then they heard water running. (Doc. 125-5, p. 15; Doc. 125-8, p. 8). The officers continued to knock and say "you need to come out, this is the Mobile Police Department" but still got no response. (Doc. 125-5, p. 15). Water started to come out of the restroom from underneath the

door. (Doc. 125-5, p. 15; Doc. 125-8, p. 8). Gooden showed the officers where the cut off valve was for the water and they turned the water supply off. (Doc. 125-5, p. 16).

Officer Milbrath got a pry bar from his car and used it on the restroom door. (Doc. 125-8, p. 11). When he got the door open, they saw a male standing in the doorway, the man looked at them and shoved the door back closed. (Doc. 125-8, p. 12; Doc. 125-10, p. 8). The officers pried the door open again, this time with Officer Cotner crouched down to the right of Milbrath in position to cover him with Cotner's taser. (Doc. 125-8, p. 13; Doc. 125-10, pp. 9, 10). According to Gooden and the officers, when the door was opened, the plaintiff lunged at the officers with an open umbrella. (Doc. 125-5, p. 18; Doc. 125-8, pp. 13-14). When the plaintiff lunged at them, Officer Cotner shot the plaintiff with his taser. (Doc. 125-8, pp 14). There was only five to eight seconds after the door was opened before the officers said "freeze" or "drop" and tased the plaintiff. (Doc. 125-5, p. 17).

According to Gooden, plaintiff did not drop and was still holding the umbrella. (Doc. 125-5, p. 17). Gooden states that the plaintiff fell forward out of the restroom and one of the officers handcuffed him. (Doc. 125-5, p. 17).

Officer Milbrath testified that the plaintiff went down on his knees and tried to get up, went down on his knees again and tried to get up again. (Doc. 125-8, p. 14). The plaintiff rolled over and the officers told him to "give us your hands" but he would not do it. (Doc. 125-8, p. 15). Milbrath grabbed one of his hands and

handcuffed plaintiff. (Doc. 125-5, p. 15). Officer Milbrath testified that during the incident they did not know who was in the bathroom or what he was doing and felt there was a potential danger and treated the situation with the understanding that there was a potential threat. (Doc. 125-8, p. 20).

Officer Cotner testified that he saw the plaintiff moving toward Milbrath holding something with a pointed metal end positioned toward Milbrath and Cotner deployed his taser. (Doc. 125-10, pp. 10, 17). The probes made contact with the plaintiff and the plaintiff fell down and attempted to get back up. (Doc. 125-10, p. 10). Cotner cycled his taser for a second time while giving a very loud verbal command for him to roll over on his stomach, which he failed to do. (Doc. 125-10, p. 11). Cotner again cycled his taser a third time and again commanded him to roll over, which he did. (Doc. 125-10, p. 11). The plaintiff was on the ground when Cotner cycled his taser the third time. (Doc. 125-10, p. 11). Cotner testified that he believed the plaintiff to be a threat and that he was concerned about everyone's safety at the time because he did not know what was going on or what the plaintiff was doing. (Doc. 125-10, pp. 11, 13, 14).

The plaintiff testified that after the red and yellow smoke came in from under the door, he noticed the door bumping, he touched the door and could feel the door moving. (Doc. 125-1, p. 10). The smoke looked like steam and smelled horrible and he thought it was dangerous. (Doc. 125-1, pp. 10-11; Doc. 137-1, pp. 7-8). Plaintiff

thought it was like a devil and he turned on the water and splashed it on his face, but the smoke came back in again so he turned the water on again and tried to douse the smoke with water. (Doc. 137-1, p. 10). Plaintiff states that he held the door lock while they were hitting the door. (Doc. 125-1, p. 11). According to plaintiff, the officers only opened the door once and that was the first time he saw the officers. (Doc. 125-2, p. 3; Doc. 137-1, p. 9). Until then, plaintiff thought it was not real, he was surprised to see the policemen when the door suddenly opened. (Doc. 137-1, p. 9).

Defendants' expert, William T. Gaut, opined that the officers' actions "were in keeping with police standards and generally accepted practices." (Doc. 125-14, p. 5). According to Gaut, the force used by the officers "was objectively reasonable and in keeping with police standards and generally accepted police practices." (Doc. 125-14, p. 5).

The officers asked if plaintiff had any identification; the plaintiff did not respond, so they checked his pockets and found an ID card indicating plaintiff was hearing impaired or deaf. (Doc. 125-5, p. 17; Doc. 125-8, p. 15). Plaintiff had a hearing aid on one of his ears. (Doc. 125-8, p. 16).

When the paramedics arrived, one of them knew sign language and was able to communicate with the plaintiff. (Doc. 125-8, p. 16). The officers took plaintiff's handcuffs off so that he could sign with the paramedic. (Doc. 125-1, p. 13). The

plaintiff gave her a telephone number for his mother and Milbrath tried calling her, but it was a wrong number. (Doc. 125-8, p. 16; Doc. 125-8, pp. 17-18). Plaintiff testified that he had forgotten his phone number and his address. (Doc. 125-2, p. 5). They could not get in contact with any family members and Rodgers believed plaintiff was still a threat to the public and to himself. (Doc. 131-1, p. 14). According to Rodgers, the plaintiff had violated state law in their presence and Rodgers believed probable cause existed to arrest plaintiff. (Doc. 131-1, p. 14). Lieutenant Rodgers ordered the officers to arrest plaintiff. (Doc. 131-1, p. 12). The officers arrested plaintiff for disorderly conduct, resisting arrest, and failing to obey an officer. The officers took plaintiff to the metro jail and Milbrath told the Magistrate what happened. (Doc. 125-8, p. 19). The Magistrate contacted Judge Little who decided not to sign a warrant for the plaintiff under the circumstances. (Doc. 125-8, p. 19).

## **DISCUSSION**

### **A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."  The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" <u>Bailey v. Allgas, Inc.</u>, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>See</u> <u>Anderson</u>, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists. <u>O'Ferrell v. United States</u>, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." <u>Miranda v. B&B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1534 (11th

Cir. 1992) (citing <u>Mercantile Bank & Trust v. Fidelity & Deposit Co.</u>, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 524 (11th Cir. 1994)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B. Plaintiff's Claims

Although plaintiff's complaint asserts various state law claims, plaintiff only opposed defendants' summary judgment motions as to (1) a § 1983 claim against Officer Joe Cotner for excessive force based on Cotner's third tasering of the plaintiff and (2) a § 1983 claim against Lieutenant Kevin Rodgers for false arrest. "In opposing a motion for summary judgment, a 'party may not rely on his pleadings to avoid judgment against him.'" Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied sub nom., Jones v. Resolution Trust Corp., 516 U.S. 817 (1995)(citing Ryan v. Int'l Union of Operating Eng'rs., Local 675, 794 F.2d 641, 643 (11th Cir. 1986)). Moreover, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Id. at 599 (citations omitted). Accordingly, summary judgment will be entered in favor of defendants as to all claims other than the two § 1983 claims mentioned above for excessive force and false arrest.

### 1. Excessive Force

Plaintiff asserts that Officer Cotner used excessive force when he tasered plaintiff the third time. Cotner asserts that he is entitled to qualified immunity.

Section 1983 provides a federal forum for citizens to remedy deprivations of civil liberties. However, "[q]ualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). Here, it is clear that Officer Cotner was acting within the scope of his discretionary authority and plaintiff has conceded that he was. (Doc. 137, p. 6). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

Under Saucier v. Katz, 533 U.S. 194 (2001), the "threshold question" to be determined before any other inquiry is: "[t]aken in the light most favorable to the

party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. Only if the answer to that question was affirmative, may the court proceed to determine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." Id. The court notes that this two-part inquiry established in Saucier is no longer mandatory. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). If no constitutional right was violated, the court need not inquire further. Id. If, however, a constitutional violation occurred, the court must then determine whether the right was clearly established. Id.

In considering the first step of Saucier's two-step qualified immunity inquiry, we must determine whether plaintiff's constitutional right to be free from excessive force was violated. Under the Fourth Amendment, officers may only use such force as is "objectively reasonable" under the circumstances. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The court, in making this determination, must presume that the plaintiff's version of events is true. See Hope v. Pelzer, 536 U.S. 730, 736 (2002) (The threshold inquiry is "whether plaintiff's allegations, if true, establish a constitutional violation." emphasis added). The Supreme Court described

the "objectively reasonable" standard to be applied in such excessive force cases as

follows:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. Id., at 8, 105 S.Ct., at 1699, quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S.[1], at 22-27 [(U.S. Ohio 1968)], 88 S.Ct. [1868], at 1880-1883 [(1968)]. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See Tennessee v. Garner, 471 U.S. [1], at 8-9 [(1985)], 105 S.Ct.[1694], at 1699-1700 [(1985)] (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, 392 U.S., at 20-22, 88 S.Ct., at 1879-1881. . . .  With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d [1028], at 1033 [(2d Cir. 1973)], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

14

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978); see also Terry v. Ohio, supra, 392 U.S., at 21, 88 S.Ct., at 1879 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Scott v. United States, supra, 436 U.S., at 138, 98 S.Ct., at 1723, citing United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

Graham, 490 U.S. at 396-397, 109 S.Ct. at 1871-1872. "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand" Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) (internal quotation marks omitted). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205.

If the court determines that defendants violated plaintiff's Fourth Amendment rights, the court must then turn to the second step in the analysis, whether those rights were clearly established. Even if the court were to hold that the officers violated the Fourth Amendment, the officers are still entitled to immunity if their actions resulted from reasonable mistakes as to the legality of their actions. Id. at 206. "[T]he law must have earlier been developed in such a concrete and factually defined

15

context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." <u>Lassiter v. Alabama A & M Univ.</u>, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)(quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).   A plaintiff can establish that the state of the law provided clear notice or warning to the officers that the conduct was unconstitutional by submitting fact-specific precedents, or demonstrating that the very conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent." <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting <u>Lee</u>, 284 F.3d at 1199).

The Eleventh Circuit has several times determined that the use of a taser did not constitute excessive force.  In <u>Mann v. Taser International, Inc.</u>, 588 F.3d 1291 (11th Cir. 2009), a hysterical and delusional arrestee (apparently high on methamphetamine) was handcuffed and shackled after extreme resistance, but continued to "kick uncontrollably" in the patrol car, shattering a rear window and bending the steel door frame. <u>Id.</u> at 1300.  The deputy's command to stop went unheeded, and the arrestee started "slamming her head up against the opposite door." <u>Id.</u>  When the officers opened the rear door furthest from the plaintiff, she "propelled herself out of the open door of the squad car, landing on her head and neck." <u>Id.</u>  This continued behavior resulted in the deputy tasing the plaintiff three times. <u>Id.</u>  An hour-and-a-half later, she died at a hospital after suffering cardiac arrest. <u>Id.</u> at 1301.

The administratrix of the arrestee's estate and survivors brought a § 1983 excessive force action against the deputy who tasered her. The Eleventh Circuit Court of Appeals held that "[t]he nature and quality of the intrusion here, namely use of a taser, was appropriate given the countervailing government interest of safety and compliance."*1249 Id. at 1306. Namely, the arrestee refused to comply with the deputy's warning to stop her "violent" and "aggressive" behavior, and she was "clearly a danger to herself and others." Id. As such, the Court found that the officer did not use excessive force.

Similarly, in Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008), the plaintiff "repeatedly ignored police instructions and continue[d] to act belligerently toward police." Id.. The Eleventh Circuit Court of Appeals found in Zivojinovich that Sheriff's deputies were entitled to qualified immunity, despite having struck the plaintiff in the face causing a broken nose and having used a taser which caused the plaintiff's legs to give out, because the deputies' conduct was reasonably proportionate to the need for force in light of plaintiff's resistance to the arrest. Id. at 1072–73. The Court concluded that "there was no Fourth Amendment violation" and that, consequently, there was no need to address the second prong of the qualified immunity analysis. Id. at 1072. See also Chaney v. City of Orlando, Florida, 291 Fed.Appx. 238, 244 (11th Cir. 2008) (affirmed trial court's conclusion that the officer who pulled the plaintiff out of his car, threw him to the pavement, handcuffed him,

used his Taser on plaintiff's back, or put his foot on plaintiff's head "followed police procedures, that no clearly established law provided him with notice that his actions could have been considered excessive force or unreasonable, and that his actions did not violate [plaintiff's] Fourth Amendment rights.").

In Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004), the plaintiff was "hostile, belligerent, and uncooperative." Id. at 1278. In Draper, a police officer effectuated an arrest after a traffic stop by the "single use of [a] taser gun" on an unrestrained suspect who was "hostile, belligerent, and uncooperative." Id. at 1278. The Eleventh Circuit Court of Appeals held that the use of the taser "was reasonably proportionate to the difficult, tense and uncertain situation" the suspect created when he refused multiple times to retrieve documents from his truck cab, accused the officer of harassment, used profanity and "repeatedly yelled." Id. "Under the 'totality of the circumstances,' [the officer's] use of the taser gun did not constitute excessive force." Id.

In contrast, plaintiff cites Oliver v. City of Orlando, 574 F.Supp.2d 1279 (M.D. Fla. 2008), to support his contention that Cotner's use of force was excessive. In Oliver, the court found that the officers were not entitled to qualified immunity for their taser use. However, the facts in Oliver are very different from the facts in the instant case. In Oliver, a police officer encountered Oliver in the median of the street and attempted to flag her down. Id. at 1281. Oliver tried to get in the police car when

18

the officer approached. Id. Oliver complied with several commands to back up, both before the officer exited her car and after she got out of the car to investigate. Id. Oliver was acting fidgety, talking loudly, and making gestures with his hands. Id. at 1282. A second officer on the scene tried to guide Oliver across the street to the sidewalk, "but Oliver stopped in the middle of the street and began to babble incoherently." Id. The second officer then tried to force Oliver across the street, but Oliver pulled away. Id. Burk held on to Oliver's shirt as Oliver flailed his arms and attempted to push him away. Id. At that point, the first officer discharged her taser at Oliver, hitting him in the abdomen. Id. The officer continued to tase Oliver two or three more times as Oliver lay on the ground, even loading a replacement cartridge into her taser after one of the taser wires became disconnected. Id. The officer tased Oliver until he stopped moving. Id. Oliver was put in an ambulance and suffered a seizure. Id. at 1283. He was taken to the hospital, but his health deteriorated and he died several weeks later. Id. The court found the officer's first use of the taser was not unreasonable because Oliver created a danger to himself and others when he attempted to break free of the other officer who was guiding him across the street. Id. at 1285. The court, however, found that the officer had used excessive force as to the subsequent taser discharges, finding it significant that Oliver had complied with the officer's instructions except for the street crossing, presented no danger to himself or others, the officers did not order Oliver to stay on the ground, and the officers made no

19

attempt to restrain Oliver by conventional means after tasing him the first time. <u>Id.</u> at 1286-87; <u>see</u> <u>also</u> <u>McNally v. Eve</u>, 2008 WL 1931317 (M.D. Fla. 2008) (finding no qualified immunity for officers who tased Plaintiffs who posed no threat to officers or others, never resisted or attempted to flee, and committed minor crime of noise violation).

In the instant case, the plaintiff, as in <u>Mann</u> and <u>Zivojinovich</u> , refused to comply with the arresting officers' requests, and appeared to be a danger to himself and others. Although plaintiff was on the ground when Cotner cycled his taser the third time, he was not secured and continuing to ignore police instructions. While the crimes the plaintiff was ultimately arrested for were only misdemeanors, the officers reasonably believed under the circumstances that the suspect posed an immediate threat to the safety of others and himself. The plaintiff was actively resisting arrest and refused to comply with the officers' instructions. Although it was later discovered that plaintiff was deaf and could not hear the officer's instructions, none of the officers knew plaintiff was hearing impaired at the time. As previously discussed, the reasonableness of an officer's conduct is not to be judged with hindsight but from the perspective of a reasonable officer on the scene. Thus, the fact that the judge later refused to sign the warrant for plaintiff's arrest after knowing all of the facts is irrelevant to the officers' determination of proper force at the scene. The officers believed the plaintiff was a threat and were concerned about everyone's safety at the

time because no one knew what the plaintiff was doing. Under the circumstances, their concern was clearly reasonable. The court finds that Cotner's use of force was commensurate with the level of threat and was objectively reasonable under the totality of the circumstances. Accordingly, Cotner did not violate plaintiff's constitutional rights.

Even if the court were to hold that Officer Cotner violated plaintiff's constitutional rights, the court finds that Cotner is still entitled to immunity because it was reasonable for Cotner to believe his actions were legal. Plaintiff has not established that the state of the law provided clear notice or warning to the officers that the conduct was unconstitutional. Plaintiff concedes that there is no case law directly on point, but argues that the unlawfulness was apparent in light of pre-existing law. Plaintiff cites several cases which are factually distinguishable from this case. E.g. Stephens v. City of Butler, Ala., 509 F.Supp.2d 1098, 1112-13 (S. D. Ala. 2007) (denying qualified immunity where the officers tasered an unarmed arrestee four times; the arrestee made no effort to escape and no movement that could be deemed an attack, and the officers used force only because the arrestee was being verbally unruly and refusing to don jail garb); Buckley v. Haddock, 2007 WL 710169, *1 (N.D. Fla. Mar. 6, 2007) (denying qualified immunity where the officer tasered the handcuffed plaintiff for refusing to cooperate in his arrest for failing to sign a traffic citation; although the evidence revealed that one application of the taser may

arguably have been appropriate, multiple applications of force were unnecessary and grossly disproportionate); Maiorano v. Santiago, 2005 WL 1200882, (M.D. Fla. May 19, 2005) (denying qualified immunity where the plaintiff had not physically or verbally threatened the officer and the officer tasered the plaintiff without advance warning or a verbal command to desist from engaging in a physical altercation with another student).  The case law does not make it obvious that defendant's conduct violated federal law.  Any unlawfulness of the officer's conduct was not readily apparent. Therefore, summary judgment is due to be granted as to plaintiff's excessive force claim.

### 2. False Arrest

Plaintiff contends that Rodgers did not have probable cause to arrest him for disorderly conduct, resisting arrest, and failing to obey an officer.   Rodgers asserts that he is entitled to qualified immunity.  The same analysis discussed above regarding qualified immunity for Cotner is applicable to Rodgers.  That is, to receive qualified immunity, Rodgers must prove that he was acting within the scope of his discretionary authority and if that is established, the plaintiff then has the burden of showing that immunity is not appropriate because Rodgers violated a clearly established constitutional right.  Plaintiff does not dispute that Rodgers was acting within his discretionary authority. (Doc. 139, p. 6).  Thus, it is plaintiff's burden to demonstrate that qualified immunity is not appropriate.

22

"There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment." Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997) (citing Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990)). "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." United States v. Jimenez, 780 F.2d 975, 978 (11th Cir. 1986) (internal quotation marks and citations omitted). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Adams v. Williams, 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). "While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007). For qualified immunity from a claim of unlawful arrest, an officer need not have actual probable cause, but only arguable probable cause. Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003). Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant [ ] could have believed that probable cause existed to arrest [the] [p]laintiff." Kingsland v. City of Miami, Fla., 382 F.3d 1220, 1232 (11th Cir. 2004) (citing Von Stein, 904 F.2d at 579). The plaintiff bears the burden to "demonstrate

that no reasonable officer could have found probable cause under the totality of the circumstances." Id.  Thus, "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Holmes, 321 F.3d at 1079 (internal quotations marks and citations omitted).

Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern. Skop, 485 F.3d at 1137–38. Arguable probable cause does not, however, require an arresting officer to prove every element of a crime before making an arrest, because such a requirement "would negate the concept of probable cause and transform arresting officers into prosecutors." Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001).  Thus, the inquiry is "whether [the defendant] violated clearly established law in making the arrests based on the objective factors that gave rise to his probable-cause determination and not whether the arrestees' actions actually constituted a crime." Id. at 1303 n. 8.

The crime of disorderly conduct in Alabama is codified at § 13A-11-17 which provides the following:

> A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
> (1) Engages in fighting or in violent tumultuous or threatening behavior; or
> (2) Makes unreasonable noise; or
> (3) In a public place uses abusive or obscene language or makes an obscene gesture; or

(4) Without lawful authority, disturbs any lawful assembly or meeting of persons; or

(5) Obstructs vehicular or pedestrian traffic, or a transportation facility; or

(6) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse.

ALA. CODE § 13A-17-11-7. Rodgers asserts that the plaintiff disturbed the lawful assembly of persons at the Dollar General store. Plaintiff argues that he is only guilty of having stomach cramps and going to the restroom. However, the plaintiff did more than simply use the restroom. The plaintiff barricaded himself in the restroom for an extended period of time. Although the plaintiff apparently could not hear Gooden or the officers demand that he open the door, he knew they were trying to open the door. The plaintiff actively prevented them from opening the door by holding the lock and bracing the door with his foot. At the time of the arrest, Rodgers knew plaintiff was hearing impaired, but the extent of his hearing capability was not known. Plaintiff wore a hearing aid which suggested that he has some hearing. There is also no indication that Officer Rodgers knew of the plaintiff's mental condition or that plaintiff was having hallucinations during the incident. At the time of his arrest, a reasonable officer might believe that plaintiff knowingly caused a disturbance by refusing to cooperate with the police and open the door. While Rodgers argues that the plaintiff also lunged at the officers and forcefully slammed the door in their face, under the plaintiff's version of events the door was only opened once and he did not lunge at the officers. As such, there is an issue of fact regarding such allegations.

25

However, the facts clearly demonstrate that plaintiff's conduct disturbed business at the Dollar General store causing public inconvenience and alarm. The store had to be closed for the safety of the public while the officers investigated and attempted to control the situation. There was some question as to what to do with the plaintiff once the incident was over and it was not clear whether charges should be brought against him or not. Nevertheless, it was reasonable for an officer to believe there was probable cause to arrest plaintiff for disorderly conduct. The fact that the judge decided not to authorize charges under the circumstances does not mean there was not arguable probable cause. Even if plaintiff had been found not guilty of the charge, there can still be arguable probable cause because an arresting officer is not required to prove every element of a crime before making an arrest. The court finds that Rodgers did not violate clearly established law by arresting plaintiff for disorderly conduct.

As to the charge of failing to obey, the Mobile City Code provides that:

> It shall be unlawful and an offense against the city for any person to fail to obey the direction or order of a member of the police department of the city while such member is acting in an official capacity in carrying out his duties.

MOBILE CITY CODE § 39-54. The plaintiff clearly failed to obey the officers by refusing to open the door and by failing to follow their direction after the door was pried open. As discussed above, at the time of the arrest, Rodgers knew plaintiff was hearing impaired, but he did not know the extent of the impairment. Moreover, the plaintiff

actively refused to open the door by bracing it with his foot.  Under the circumstances, the court finds it was reasonable for the officers to believe that he intentionally disobeyed their demands.  Accordingly, the court finds that Rodgers had arguable probable cause to arrest the plaintiff for failure to obey.

As to the last charge, "[a] person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or another person." ALA. CODE § 13A-10-14.  Here again, Rodgers knew that plaintiff was hearing impaired, but did not know the degree of impairment. As such, the plaintiff's refusal to submit to the officers provided arguable probable cause for Rodgers to arrest plaintiff for resisting arrest.


## CONCLUSION

For the reasons stated above, motion of Joe Cotner for summary judgment (Doc. 124) and the motion of Kevin Rodgers for summary judgment (Doc. 127) are **GRANTED.**

**DONE and ORDERED** this 29th day of August, 2011.


/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE